UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Sushma Anand Akoju</u>

     v.                       Civil No. 26-cv-101-LM-TSM
                                Opinion No. 2026 DNH 015 P

<u>University of New Hampshire et al.</u>

## O R D E R

Until recently, pro se plaintiff Sushma Anand Akoju was enrolled as an international graduate student in computer science at the University of New Hampshire (UNH). In early February 2026, Akoju lost her student status when UNH did not allow her to enroll in classes for the spring semester. Akoju brings this action against UNH, UNH Assistant Dean for Graduate Student Affairs Dr. Dovev Levine, and UNH Assistant Director of Housing Jeremy Homolka alleging violations of Title VII, 42 U.S.C. § 2000e-3(a), and the Fourteenth Amendment's procedural due process protections.[1]

In her Title VII claim, Akoju alleges that UNH refused to allow her to enroll in courses and is evicting her from student housing in retaliation for filing a charge against UNH with the Equal Employment Opportunity Commission (EEOC). In her related constitutional claim, Akoju alleges that UNH failed to provide sufficient notice and an opportunity to respond before terminating her student status and denying her request to be reinstated. At risk of losing her UNH housing and her

---

[1] Levine and Homolka are sued in their official capacities. The court refers to the defendants collectively as UNH.

lawful immigration status as an F-1 student visa holder, Akoju seeks a Temporary Restraining Order ("TRO") directing defendants to "maintain [her] F-1 status" and halt her eviction from university housing. Doc. no. 4 at 3. Akoju also asks this court to order defendants not to report her changed enrollment status via the Student and Exchange Visitor (SEVIS) system, a web-based system that Immigration and Customs Enforcement (ICE) uses to maintain information regarding F-1 students studying in the United States.[2] See Liu v. Noem, 780 F. Supp. 3d 386, 394 (D.N.H. 2025) (explaining that "F-1 students fail to maintain their status when they do not meet certain regulatory requirements, such as failing to maintain a full course of study"), appeal dismissed, No. 25-1643, 2025 WL 3904829 (1st Cir. Aug. 14, 2025). On February 19, 2026, this court held an evidentiary hearing on Akoju's motion. For the following reasons, Akoju's motion for a TRO (doc. no. 4) is denied.

## STANDARD OF REVIEW

"A temporary restraining order 'is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available.'" Ginzburg v. Martínez-Dávila, 368 F. Supp. 3d 343, 347 (D.P.R. 2019) (quoting Pro-Choice Network v. Schenck, 67 F.3d 377, 388-89 (2d Cir. 1995)). A temporary restraining order ("TRO") is nevertheless an extraordinary remedy which must be granted "sparingly and only in cases where the need for extraordinary equitable

---

[2] Akoju also asks that the court "[p]rohibit Defendants from taking any further adverse action against Plaintiff in retaliation for her EEOC charge," and to "[s]chedule an expedited hearing on Plaintiff's request for a preliminary injunction." Doc. no. 4 at 3.

relief is clear and plain." Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs, 453 F. Supp. 2d 333, 338 (D.N.H. 2006) (quotation omitted).

In evaluating a motion for a TRO, the court considers the same four factors that apply to a motion for a preliminary injunction. Karlsen v. Town of Hebron, Civ. No. 18-cv-794-LM, 2018 WL 11273651, at *1 (D.N.H. Sept. 28, 2018). The moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). Likelihood of success and irreparable harm are the most important factors. Strahan v. McNamara, 642 F. Supp. 3d 204, 207 (D.N.H. 2022). "These two factors are reviewed on a 'sliding scale,' such that a strong showing on one prong can make up for a somewhat weaker showing on the other." Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs., 743 F. Supp. 3d 325, 335 (D.N.H. 2024) (quoting Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009)), appeal docketed, No. 25-2185 (1st Cir. Dec. 10, 2025). However, "whether the movant is 'likely to succeed on the merits' is the 'sine qua non' of the test for a preliminary injunction and, therefore, for a TRO." Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 592 F. Supp. 3d 1, 3 (D. Mass. 2022) (quoting Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)). Thus, "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle

curiosity." Karlsen, 2018 WL 11273651, at *1 (quoting Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam)).

## FINDINGS OF FACT

The following findings of fact are based upon the testimony at the February 19 hearing and the parties' exhibits.[3] At the hearing, Akoju testified on her own behalf. UNH called three witnesses: Jeremy Homolka, Assistant Director of Housing for Occupancy Management; Elizabeth Stevens, Director of Student Financial Services; and Dr. Dovev Levine, Assistant Dean for Graduate Student Affairs and Provost for Enrollment.

Akoju is an Indian national who first came to the United States in 2014 to pursue academic research in artificial intelligence (AI). Akoju obtained two master's degrees — one from the University of Pittsburgh and one from the University of Colorado — before beginning her Ph.D. studies at the University of Arizona in Fall 2022. In August 2024, after completing several semesters in Arizona, Akoju transferred to UNH to continue to pursue her Ph.D. under the mentorship of Professor Laura Dietz, in the computer science department, who was to serve as her academic advisor.[4] In the Fall 2024 semester, Akoju enrolled in one course taught

---

[3] Counsel for UNH asserted objections to various exhibits throughout the hearing that the court took under advisement in an effort to keep the hearing within the time allotted. The court sees no need to provide rulings on the individual objections beyond the court's factual findings.

[4] Akoju transferred to UNH in part to distance herself from one or more persons in Arizona against whom she had sought and obtained a no-contact order.

by her advisor and registered for a course designed for Ph.D. students engaging in their own independent research.

Within just one month of Akoju's arrival at UNH, her relationship with Professor Dietz fell apart, and Akoju refused to work with her. It is not entirely clear why the relationship dissolved. It appears that Akoju perceived a slight in the way Dietz treated her. Akoju was never able to secure a new primary advisor after she lost Professor Dietz.

Akoju was aware of the need to secure a primary advisor. The Computer Science Department's Graduate Program Handbook ("Handbook") requires students to be affiliated with an advisor at all times and makes clear that students may be dismissed from their program if they are "not making satisfactory progress toward their degree." Doc. no. 14-9 at 12. According to the Handbook, the Department evaluates academic progress using metrics including "having a research mentor" and "progress in research . . . and performance in coursework." Id. Notwithstanding these requirements, Akoju was unable to secure an advisor after her early fallout with Professor Dietz, and she made little progress in her coursework.

On September 27, 2024, UNH sent Akoju a formal letter telling her that she was required to find another advisor in order to be considered for funding beyond the Spring 2025 semester. Doc. no. 13-4. Exactly a year before her student status was ultimately terminated, Akoju emailed Dr. Levine about her search to find an advisor and her efforts to make academic progress, which she described as working towards meeting Dr. Levine's "expectations." Id.

Akoju's difficulties at UNH continued beyond her initial semester. On April 9, 2025, a UNH administrator wrote to Akoju:

> You currently do not have a research advisor. Based on communications with my office, it is clear you do not wish to work with Professor Dietz . . . [and] the research you are interested in limits the pool of potential advisors. Additionally, the responsibility of identifying an advisor rests with the student. . . . Students must identify an advisor who would then need to agree to work with that student.

Doc. no. 13-20 at 14.

In the spring of 2025, Akoju developed carpal tunnel syndrome for which she received academic accommodations. Around that same time, Akoju filed a Title IX complaint against a neighbor in her university housing after an alleged incident of sexual harassment. After an investigation, UNH's Civil Rights and Equity Office (CREO) sent a letter dated April 2, 2025, to Akoju's professors directing them to "work with [her] to identify any academic flexibility that would assist [her]." Doc. no. 13-11 at 1. Ultimately, however, by the end of the Spring 2025 semester, Akoju only successfully completed one full course and a one-credit graduate seminar in the Computer Science Department. Doc. no. 14-9 at 2, 16. This, combined with the one full course she completed in her first semester, represents the extent of her successfully completed coursework in the UNH Computer Science Department. Id.

In the summer of 2025, while Akoju was working a student job with the UNH Housing Office, she filed with CREO a complaint of workplace harassment alleging that two different supervisors made inappropriate comments towards her. She alleged that the first incident occurred on June 9 and the second on July 2. Akoju

asked CREO to impose a no-contact order between herself and her team leader and requested that supervisory staff engage in workplace anti-harassment training.[5]

Akoju continued to have difficulties as she entered the Fall 2025 semester. Because Akoju was behind on her tuition payments, in accordance with UNH policy, UNH Student Financial Services put a financial hold on Akoju's student account, which made her unable to register for classes.[6] This led Akoju to fear that she would miss the final deadline to register for classes, which, in turn, would lead to Akoju losing her active student status, pursuant to UNH's "Continuous Registration Policy."[7] Doc. no. 14-17 at 1.

Under this policy, when a student fails to register for classes by the relevant deadline, the student's degree status is discontinued, and the student must petition the Graduate School administration for reinstatement.[8] Id. at 3. Once the Graduate

---

[5] It is unclear what came of Akoju's report and requests.

[6] Akoju was aware of UNH's Student Financial Responsibility Agreement; she signed it on May 16, 2024. That document makes clear that a failure to make timely payment will result in a financial hold being placed on a student's account, preventing them from registering for classes. Doc. no. 14-19.

[7] Under the policy, "[s]tudents who do not maintain continuous enrollment as required will have their degree status discontinued and will no longer be active in the degree. Students will need to petition for reinstatement or readmission in order to return to their program." Doc. no. 14-17 at 1. A petition for reinstatement "requires a reinstatement fee, plus payment of current semester charges and any late fees that may have accrued." Id. at 3.

[8] The "Graduate School" at UNH oversees approximately fifty academic departments, including the computer science department, and sets minimum standards by which those departments must function. These minimum standards include the Continuous Registration Policy described above. Dr. Levine's office at the Graduate School is responsible for implementing this policy.

School receives such a petition, it consults with the relevant department and faculty members to determine whether they approve of the student's petition. Dr. Levine testified that when determining whether to grant a petition for reinstatement, his office looks for "clear evidence" that the student will be able to successfully obtain their degree if returned to active status.

Akoju's experience facing a financial hold in 2025 demonstrates her personal knowledge of UNH's continuous registration policy and its potential impact on her immigration status. On September 11, on the eve of what Akoju described as the "F1 VISA termination deadline," Akoju sent a slew of emails to UNH administrators telling them that she had finally paid her outstanding tuition and that she needed to register for courses to maintain her F-1 visa status. Doc. no. 14-5 at 7. Before the end of the day on September 12, UNH removed the financial hold preventing Akoju from registering and granted her petition to enroll in classes late,[9] allowing her to maintain her active student status. See doc. no. 14-13 at 1-8. While Akoju did re-enroll in courses, UNH warned that the courses for which Akoju registered—a one-credit internship and doctoral research—would not contribute to academic progress toward her degree. Id. at 1-2.

Throughout Akoju's time at UNH, she had difficulties paying her tuition and meeting degree requirements, such as securing an advisor. A series of emails

---

[9] Akoju had missed the deadline to enroll in classes on UNH's web portal, so, per UNH policy, she needed to file a petition and gain the approval of the professors whose classes she wished to join in order to enroll. See doc. no. 14-13 at 11-12.

between Akoju and Dr. Levine in October 2025 reveal both the efforts UNH made to communicate with Akoju about these concerns and Akoju's awareness of her predicament. On October 1, Akoju wrote to Dr. Levine asking for a meeting to discuss her situation. Akoju acknowledged that she had been unable to secure an advisor and that her "situation has now reached a critical point," and she needed assistance. Doc. no. 13-20 at 16. Akoju included a list of questions to which Dr. Levine responded in an email dated October 2. See id. at 13.

In his October 2 email, Dr. Levine referenced the "numerous meetings over the past year" with Akoju and their discussions about the need for her to find an advisor and complete degree requirements. Id. at 14. Dr. Levine wrote: "Given the lack of other potential UNH graduate faculty who specialize in your stated area of research, I want to reiterate my concerns about your path towards successful completion of your degree program." Id. at 15. He once again explained that "PhD students are responsible to define their own research and find faculty with expertise in that area to serve as dissertation advisors." Id. Dr. Levine agreed to Akoju's request to meet in person to discuss this but reminded her that she would "need to come to the meeting" with the name of an advisor and "next steps" toward completing her degree. Id.

In these October 2025 emails, Akoju acknowledged that UNH may not be the best place for her to continue her academic work. She also recognized that she faced looming financial challenges, as she had an outstanding balance (about $10,000) for the Fall 2025 semester. In advance of her meeting with Dr. Levine and Professor

Radim Bartos (the Chair of the Computer Science Department), Akoju wrote an email to them on October 10 expressing the following concern about her F-1 visa status: "Given the urgency of my situation as an international student with F-1 visa timeline constraints and the upcoming end of the Fall 2025 semester, I would appreciate confirmation of your availability to meet." Id. at 7. A review of the subsequent emails (between Akoju and Dr. Levine in October) make clear that Akoju's ability to remain enrolled at UNH would depend on the Computer Science Department's approval. See id. at 1-7.

On November 13, 2025, Akoju emailed an administrator in the Computer Science Department informing her that she had been unable to participate in her remote internship (for which she was supposed to receive academic credit) because her internship required her to engage (remotely) with a man against whom she had a no-contact order from her time at the University of Arizona. Akoju expressed concern that her lack of participation would lead to her failing the internship class, and that the deadline to drop the class had passed. On December 17, a staff member of UNH Student Financial Services emailed Akoju informing her that her petition to withdraw from the internship course had been approved, pending Akoju's payment of approximately $10,000 that she owed on her student account. The following day, December 18, Akoju filed a charge of discrimination with the EEOC relating to the alleged workplace discrimination that she had reported to UNH in the summer of 2025.

On January 10, 2026, Akoju received a bill from UNH reflecting that she had an outstanding balance of $14,712 — a figure that included a $10,061 previous account balance as well as a new $4,584 charge for university housing for the Spring 2026 semester. Although the bill was due on February 1, 2026, that date came and went without any payment. Accordingly, UNH placed another financial hold on Akoju's student account, making her unable to register for classes for the spring semester.

Dr. Levine testified that on at least six occasions, UNH notified Akoju that February 6, 2026, was the deadline by which she had to register for courses for the spring semester. One such notice, sent from UNH Housing Office, informed Akoju that if she did not register for classes and enroll as a full-time student by February 6, 2026, she would be forced to move out of her university housing, per UNH's Room and Board agreement.[10] Doc. no. 14-4.

On February 6, the day of the deadline, Akoju exchanged a flurry of emails with UNH Student Financial Services. See doc. no. 13-28 at 1-5. Akoju copied Dr. Levine on each email. In these emails, Akoju advised a staff member that she would be paying her account balance and requested that the financial hold be removed so that she could register for courses. However, Akoju represented that she only had funds to pay the approximately $10,000 she still owed from past semesters but did not have the $4,584 she presently owed for spring housing. Akoju requested "an exception or alternative arrangement" to allow her to register for classes so that she

_____

[10] Akoju signed this agreement on October 28, 2024. Doc. no. 14-7.

11

would not lose her F-1 student status. Doc. no. 13-28 at 1. In several of these emails, especially as it becomes clear to Akoju that UNH would require her to pay her balance in full to lift the hold, Akoju mentioned that she has filed an EEOC complaint. Doc. no. 13-28 at 1-3.

That same day, Akoju delivered a $10,129 cashier's check to UNH, but, as the staff member at UNH Student Financial Services explained, Akoju still owed $4,583 in order to make her account current. Accordingly, UNH Student Financial Services did not remove the financial hold from her account, and Akoju was unable to register for classes. Doc. no. 13-28 at 1-3.

Later that day, Akoju sent an email to the UNH Housing Office and Student Financial Services demanding that they remove the financial hold so that she could enroll and maintain her F-1 visa status. Doc. no. 14-15 at 1-3. Akoju laid out her "pending EEOC charge regarding UNH Housing's summer job discrimination and its consequences" and demanded that UNH "work directly with EEOC and promptly resolve the financial hold and related housing issues so I can remain enrolled." Id. at 2. In this letter, she claimed that the "accelerated Spring 2026 housing payment deadline . . . appears retaliatory. . . ." Id. She stated she was copying EEOC "for context." Id. On this correspondence, Akoju also copied numerous officials at UNH, including Dr. Levine, the president, and UNH's legal counsel, as well as the EEOC intake office in Boston.

The following day, on February 7, Dr. Levine sent an email to Akoju confirming that her degree status had been discontinued effective February 6

because her failure to pay her account balance in full resulted in her failure to register for classes. Id. at 1. Dr. Levine wrote:

> As we advised repeatedly, the last day for graduate students to register and pay without having their degree status discontinued was February 6, 2026. As was also noted in numerous past emails to you from the UNH Student Financial Services Office, your balance was required to be paid in full, with payment clear, before holds would be removed so that you could register. Your partial payment of your account balance on February 6 unfortunately did not meet those requirements. Accordingly, your degree status is discontinued effective February 6, 2026.

Id.

On February 9, Akoju emailed Dr. Levine a hypothetical question: if she were able to pay the outstanding $4,584 she still owed, would UNH allow her petition for reinstatement? The following day, Dr. Levine responded in the negative. Doc. no. 14-16 at 1-2. He explained that the Computer Science Department had informed him that Akoju had failed to make progress towards her degree. And with respect to her late registration, Dr. Levine informed Akoju that the department had heard nothing from her until the February 6 deadline to petition for enrollment. Dr. Levine added that the course in which Akoju sought to enroll "is designed for students who are actively working on dissertation research and is not simply a way to maintain student status."[11]  Id. at 1. Thus, as Dr. Levine explained: "[E]ven if you

---

[11] In a February 6 email to Dr. Levine, Professor Bartos (Chair of the Computer Science Department) summarized his reasons for not supporting Akoju's petition for reinstatement:

are able to resolve the financial balance your petition to be reinstated will not be approved." Id. Dr. Levine explained that UNH would hold off on reporting her change in status to SEVIS until February 13 to provide her with "additional time to make necessary arrangements to leave." Id. The UNH Housing Office also notified Akoju that she would be required to leave her university housing by noon on February 13. This, too, was an extension of the usual 72-hour timeframe by which students are required to move out after losing eligibility for on-campus housing.[12] See doc. no. 13-29 at 4-5.

On February 11, Akoju filed this lawsuit and the motion for a TRO. The following day, the court held a status conference at which Akoju and UNH general counsel appeared. UNH agreed that it would not update Akoju's enrollment status (within SEVIS) until February 27, 2026, and that it would maintain the status quo

---

Sushma has not made any progress towards her degree over the last semester. CS 999 is designed for students who are actively working on dissertation research. Sushma has not yet identified a PhD advisor and has no active research project within the department. She has also not completed the requisite number of 800- and 900-level courses for the PhD. We are therefore uncomfortable with allowing her to register, yet again, for a class that is simply a placeholder and a way to maintain student status. . . . At this time, the department is recommending dismissal from the CS PhD program.

Doc. no. 14-14 at 3. Bartos did not copy Akoju on this email.

[12] UNH had originally emailed Akoju on February 6 requesting that she move out by 4 p.m. on February 9. Doc. no. 13-29 at 5.

regarding Akoju's housing until the court could hold a hearing and issue this order on the pending motion for a TRO.

## DISCUSSION

As described above, to obtain a TRO, a plaintiff must demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of relief, that the balance of equities is in her favor, and that injunctive relief is consistent with the public interest. Karlsen, 2018 WL 11273651, at *1. Where, as here, the plaintiff fails to establish any likelihood of success on the merits, the court need not address the remaining factors. See id.

I.    Akoju is Unlikely to Succeed on Her Title VII Claim

Akoju claims that defendants terminated her student status and threatened to evict her from her university housing in retaliation for a charge she filed with the EEOC on December 18, 2025. Defendants respond that they were simply following UNH policy by requiring Akoju to pay her overdue account in full before allowing her to enroll in classes.

To prevail on a Title VII retaliation claim, a plaintiff must show that "(1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity." Stratton v. Bentley Univ., 113 F.4th 25, 41-42 (1st Cir. 2024) (quoting Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007)). A plaintiff must prove that the employer would not have taken the adverse action "but for" a desire to retaliate. Id. at 44. "Such a standard protects against a poor-performing employee shielding

themselves from termination by the mere fact that they engaged in protected conduct." Id.

As in cases of substantive discrimination, retaliation claims are assessed using the McDonnell-Douglas burden-shifting framework. Id. at 42. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision. Id. "If a defendant can do this then the burden travels once more to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor." Id. (quoting Abril-Rivera v. Johnson, 806 F.3d 599, 608 n.10 (1st Cir. 2015)). At this final step, the plaintiff must "'point to specific facts that would demonstrate' to a reasonable jury that [defendant's proffered non-retaliatory reason] was a 'sham or pretext intended to cover up retaliatory motive.'" Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 118 (1st Cir. 2024) (brackets omitted) (quoting Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 26 (1st Cir. 2004)).

Assuming Akoju has made out a prima facie case of retaliation, she is unlikely to convince a jury that UNH's proffered non-retaliatory reason for its adverse actions is pretextual or illegitimate. First, in accordance with official policy, UNH prevents students from registering for classes if their student accounts are not current. Moreover, also according to UNH policy, if a student fails to register by the registration deadline, their degree status is discontinued. Akoju admits that she had not paid her account balance in full as of the February 6, 2026 registration deadline. Thus, a jury is likely to find that it was perfectly reasonable for

16

defendants to place a financial hold on Akoju's student account that in turn prevented Akoju from registering for classes — an unfortunate although not surprising series of events that had the practical effect of terminating Akoju's degree status and jeopardizing her university housing and immigration status.

In support of her retaliation claim, Akoju argues that UNH Student Financial Services made a change (in the Fall 2025) to its policy which she describes as an "accelerated Spring 2026 housing payment deadline." Doc. no. 14-15 at 2. She maintains that, in her prior semesters, UNH had allowed her access to a "payment plan" so she could prospectively pay down the outstanding balance on her student account and keep her account active by paying the bill over the course of a term. Id. at 4. But, for this Spring 2026 semester, UNH was requiring advance payment of her housing for the upcoming semester (e.g., $4583.11 for housing). Akoju argues that UNH instituted this change in policy to retaliate against her for filing an EEOC complaint. Id. at 2. There is no evidence to support Akoju's claim.

The Director of UNH Student Financial Services, Elizabeth Stevens, testified that the change in policy occurred in Fall 2025. The court found her testimony credible. Stevens' decision to change the policy was not inspired by Akoju's EEOC complaint—which, in any event, occurred more than a month after the policy change. Rather, Stevens described the (change in) policy as a return to a "longstanding practice" that her office had previously abandoned. As Stevens explained it, the policy prohibits any student who has a history of writing checks that bounce from obtaining a payment plan. Because Akoju had a repeated history

17

of bouncing checks, Stevens decided to apply the policy to her. Stevens credibly testified that she made this decision on November 12, 2025. This was more than one month before Akoju filed her EEOC complaint. Stevens also testified that she had no interactions or communications with Akoju prior to the decision. Stevens was only aware of Akoju's longstanding history of bounced checks.

Akoju claims that UNH's financial explanation for its adverse actions is a pretext because in a February 10 email, Dr. Levine told Akoju that, even if she were to pay her outstanding account balance, UNH would still not allow a petition for reinstatement because the Computer Science Department determined that Akoju had not made satisfactory progress toward her degree. The fact that UNH would consider the views of the relevant academic department in considering a student's petition for reinstatement is not evidence of retaliation for filing an EEOC charge—it is, as Dr. Levine credibly explained to the court, in accordance with standard UNH practice. Thus, along with the financial explanations UNH has provided in its defense, UNH has an additional nondiscriminatory academic reason for refusing to permit Akoju's petition for reinstatement. These are both wholly legitimate justifications for UNH's decision, and the record evidence supports that both justifications are genuine. There is no credible evidence that these explanations were manufactured by UNH as a pretext for retaliating against Akoju for anything, much less an EEOC complaint.

The only support in the record for a theory of retaliation is the timing of Akoju's EEOC complaint, which preceded the February 6-10, 2026 emails about her

financial situation. However, the record is replete with communications to and from Akoju and UNH which show Akoju's awareness of her predicament and shaky enrollment status. And the change in policy that exacerbated the financial predicament for Akoju (for the Spring 2026 semester) predated the EEOC complaint. That policy was applied to her because of her undisputed history of bouncing checks throughout her time at UNH. In short, Akoju's EEOC complaint played no role in the situation that caused her to lose her student status.

For these reasons, Akoju has not shown any likelihood she will succeed on the merits of her Title VII retaliation claim.

II.    <u>Akoju is Unlikely to Succeed on the Merits of her Procedural Due Process Claim</u>

In Count II, Akoju alleges that defendants violated her rights to procedural due process by terminating her enrollment (and thus jeopardizing her immigration status and housing) without adequate notice or hearing.

"To establish a procedural due process violation, a plaintiff must show that (1) [she] was deprived of a protected property interest, and (2) the procedures attendant to that deprivation were constitutionally inadequate." Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 11 (1st Cir. 2013). Defendants concede, for the purposes of this motion, that Akoju has a property interest in continued enrollment. Thus, the court will focus its analysis on the second prong: whether UNH's procedures were constitutionally adequate.

"The essentials of procedural due process comprise notice of the charges and a reasonable chance to meet them." Fusion Learning, Inc. v. Andover Sch. Comm.,

609 F. Supp. 3d 5, 14 (D. Mass. 2022) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990)). However, as this court recently observed, "when a student is discharged for academic rather than disciplinary reasons, there is no requirement that he be given a hearing." Melendez v. Univ. of New Hampshire, Civ. no. 23-cv-172-SM-TSM, 2024 WL 5408179, at *16 (D.N.H. Nov. 12, 2024), report and recommendation adopted, 2025 WL 486819, at *1 (D.N.H. Feb. 10, 2025). Rather, due process is satisfied in such a situation where (1) the school fully informs the student of "the faculty's dissatisfaction with [her] academic progress and the danger that this poses to timely graduation and continued enrollment," and (2) the ultimate decision to dismiss the student is "careful and deliberate." Id. (brackets omitted) (quoting Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 85 (1978)).[13]

Like her Title VII claim, Akoju's procedural due process claim shows a low likelihood of success on the merits. When Akoju received and signed UNH's Student Financial Responsibility Agreement on May 16, 2024, she agreed that if she failed to pay her student account bill, she would be prevented from registering for courses. Doc. no. 14-19. Moreover, Akoju was on notice of UNH's continuous registration policy whereby students who fail to remain continuously registered have their degree status discontinued. This policy is published in the graduate handbook which all students are required to review and be familiar with. The uncontroverted evidence shows that Akoju was aware of this requirement. Her September 2025

---

[13] While Akoju was not technically "discharged for academic" reasons, this line of analysis appears applicable to her situation.

emails with UNH demonstrate that Akoju was well-aware that failing to per her bills would prevent her from registering for classes, and that failing to register by the deadline would result in her student status being terminated. Akoju's September 2025 episode of almost falling out of graduate student status also illustrates that Akoju was aware of the potential immigration consequences that come with losing student status.

On January 10, 2026, UNH sent Akoju a bill (due on February 1, 2026) putting her on notice of exactly what she owed. Dr. Levine testified that UNH sent Akoju at least six additional messages informing her that February 6, 2026, was the deadline by which she had to register for courses for the spring semester. She also received notice on January 22, 2026, specifically informing her that if she did not register for courses by the February 6 deadline, she would be ineligible to remain in her university housing, per UNH policy. See doc. no. 14-4.[14] Thus, the court finds that Akoju received adequate notice that if she did not pay her bills on time, she would not be able to register for classes, and if she did not register for classes, she would lose her student status and university housing.

Akoju contends that she was entitled to notice that UNH would not allow her to pay the bill over time — with a payment plan — as she had in prior semesters. But the emails to her from UNH Student Financial Services about the Spring 2026 semester were clear: she had to pay the entire bill by February 6 or she would not

---

[14] Akoju received a similar notice on August 25, 2025 (for the Fall 2025 semester). Doc. no. 14-8 at 2-3.

be allowed to register. There is no dispute that Akoju received and read the emails (beginning on January 10, 2026) alerting her to the amount that she was required to pay by February 6, 2026 to register for the Spring 2026 semester. In short, Akoju had adequate notice in advance of the due date.[15]

To the extent Akoju contends that she lacked notice that, if reinstated, the Computer Science Department would recommend her dismissal for academic reasons, that argument likewise fails. Akoju received repeated notice that failure to make progress towards her degree could result in dismissal. The Computer Science Handbook clearly states that students may be dismissed if they fail to make progress toward their degree, and that this progress is measured by, among other things, the student having a research mentor, their progress in research, and their performance in coursework. Doc. no. 14-9 at 12.

At the hearing on this motion, Akoju acknowledged that over a year before her graduate status was terminated, UNH made clear that Akoju needed to make progress towards her degree by both finding an advisor and completing courses for credit. Despite this direct warning, Akoju did not affiliate with an advisor, only completed two full courses and a research seminar (in the Computer Science Department) in her three semesters at UNH, and had not made any progress on the

---

[15] And even if the notice regarding the lack of access to a payment plan was in some way deficient, Dr. Levine made clear on February 10 that Akoju would have faced dismissal based on her lack of academic progress, even if she could hypothetically cure her financial default. See doc. no. 14-16 at 1-2. As explained herein, Akoju was certainly on notice that she was not making progress towards her degree and that that could lead to her dismissal.

department's mandatory "depth requirement" as of the time of her student status termination.[16] Doc. no. 14-9 at 3. What is more, in September 2025, when Akoju first petitioned to enroll in classes late, defendants specifically warned her that the classes she had elected to register for would not "contribute to academic progress toward her degree." Doc. no. 14-9 at 18. In sum, a jury is likely to find that defendants fully informed Akoju of their dissatisfaction with her academic performance and the danger that it posed to her continued enrollment, and that the decision to tell Akoju that her petition for reinstatement would not be granted was both careful and deliberate.[17] See Melendez, 2024 WL 5408179, at *16. For these reasons, Akoju is unlikely to be successful on the merits of her procedural due process claim.

Before moving away from this point, the court offers an observation about Dr. Levine. The record contains numerous emails between Akoju and Dr. Levine. The court was impressed with the level of detail, patience, and concern for Akoju that is

---

[16] Akoju argues that she has made academic progress as evidenced by a paper of hers being accepted in the "AAAI Bridge Program." However, as explained by the chair of the Computer Science Department, Akoju did not prepare or submit this paper as part of the department's "depth program." Doc. no. 14-9 at 3.

[17] Akoju asserts that she was denied due process because Professor Bartos, the Chair of the Computer Science Department, failed to respond to her November 3, 2025 email in which Akoju asked about the "conditions for dismissal and the Department's continued support for her enrollment." Doc. no. 22 at 5. Even if true that Professor Bartos never responded, Akoju fails to persuade the court that her claim has merit. Dr. Levine credibly testified that he was serving as the primary point person between Akoju and the school, and that he and Akoju had exchanged over 500 emails. As explained above, Akoju was on notice of what was required of her, and the evidence shows that defendants were making more than a good-faith effort to communicate with her.

apparent in Dr. Levine's email communications. As a witness, Dr. Levine impressed the court as someone who had a high degree of familiarity with Akoju. In the court's view, Dr. Levine is to be commended for the professional manner in which he communicated with and treated Akoju throughout her time at UNH.

While the court acknowledges that Akoju stands to suffer significant harm in the absence of a TRO, she still must make <u>some</u> showing of likelihood of success, and there has not been such a showing here. Thus, the court need not address the remaining TRO factors. <u>See</u> Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 100 (1st Cir. 2020).

## CONCLUSION

For the reasons stated herein, Akoju's motion for a TRO (doc. no. 4) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 26, 2026

cc:    Sushma Ananda Akoju, pro se
       Counsel of Record